United States Court of Appeals
Fifth Circuit

**F I L E D**

**May 16, 2007**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

———————————————

No. 06-10260

———————————————

AMERICAN LASER VISION, P.A.,

Plaintiff-Counter Defendant-Appellee,

versus

THE LASER VISION INSTITUTE, L.L.C. a/k/a THE LASIK VISION
INSTITUTE,

Defendant-Counter Claimant-Appellant.

———————————————

Appeal from the United States District Court
for the Northern District of Texas

———————————————

Before JONES, Chief Judge, and HIGGINBOTHAM and CLEMENT, Circuit
Judges.

PER CURIAM:

An ophthalmology company, once consisting of two doctors but eventually only one, arbitrated a complaint against a service company which helped run its clinics. The arbitrator awarded damages to the ophthalmology company, and the district court affirmed the award. Mindful of the uncertainty of the legal relationships in this case and the wide latitude given to arbitrators, we decline to vacate the award and affirm.

I

In 2000, ophthalmologists Lewis Frazee and Robert Selkin

formed American Laser Vision, which opened laser vision correction centers in Texas and Oklahoma. Frazee and Selkin were each fifty-percent shareholders of ALV, with Selkin serving as President and primary administrator.

In early 2002, ALV signed a series of contracts with The Laser Vision Institute. Under those contracts, LVI would operate the eye centers by providing management, non-medical staff, and equipment, and ALV would provide the surgeons - Drs. Frazee and Selkin. According to the agreements, LVI was to pay ALV a fee for each surgery performed. In practice, however, LVI paid Frazee and Selkin individually for the surgeries each doctor performed. ALV and LVI also agreed to share equally the profits from the sale of ocular tear plugs[1] at the centers, regardless of which surgeon installed the plugs. The contracts specifically prohibited LVI from interfering with the surgeons' professional judgment and care of patients. ALV and LVI also entered into subleases whereby LVI would pay rent to ALV for the offices, make equipment payments to vendors, and fulfill other obligations relating to the subleased office space. The agreements required ALV to provide notice of any complaints about LVI's performance and provide LVI a chance to cure. Finally, the agreements provided that any disputes would be settled by arbitration.

Drs. Frazee and Selkin performed surgeries from February

---

[1] Ocular tear plugs are small devices placed into the tear ducts which facilitate lubrication and, hence, healing.

through May.  In June, Selkin stopped performing surgeries at the LVI centers.  In a series of letters to LVI, Selkin claimed that he left because LVI staff were interfering with the treatment of patients and his professional judgment by: giving patients instructions that conflicted with his orders; using an improper solution to clean surgical supplies; changing post-operative prescriptions without his knowledge; instructing employees not to perform maintenance duties that Selkin requested; switching patients to Frazee if Selkin felt they were bad candidates for surgery; and misrepresenting to patients the risks and benefits of surgery.  In letters to LVI, Selkin wrote that he would like to return to work at the LVI centers if his concerns were addressed, but he never met with LVI or discussed how LVI might address his complaints.  Meanwhile, Selkin worked at similar centers in North Carolina and Tennessee earning substantial fees.  Selkin eventually complained that, following his withdrawal, LVI also failed to remit some professional and ocular plug revenues, improperly removed and damaged ALV equipment, and failed to pay vendors, in violation of the subleases.

ALV did not hire a replacement for Selkin, although the contract called for both Selkin and Frazee to work a certain number of hours each week.  Frazee and LVI reached an agreement and Frazee continued to perform surgeries at the LVI centers.

In December 2002, ALV and LVI terminated their agreements, and Frazee contracted directly with LVI to continue working at the

3

centers. Selkin then bought out Frazee's interest in ALV and pursued a breach of contract claim by ALV against LVI, seeking an arbitral award of $4,031,241.55 for damages from 2002-2005. ALV sought $3,524,966.67 for lost surgery and tear plug revenue due to Selkin's departure, $34,226.84 for surgeries allegedly performed but not yet paid, and less than $500,000 for the sublease and equipment claims.

The arbitrator stated that although the contract was between LVI and ALV, he would treat the contract as if it were between LVI and Selkin because LVI paid Selkin and Frazee directly. He also "sustained" LVI's objection to Selkin's figures for fees for 2004-2005, agreeing that they were unduly speculative. After a three-day hearing, the arbitrator issued an award concluding that LVI breached the professional service and sublease agreements and awarding ALV $1,842,220.39 in damages, plus interest, attorneys' fees, and costs. Although the parties had agreed that the arbitrator need not file findings or otherwise explain his decision, LVI asked the arbitrator to explain the award. The arbitrator declined, and the parties turned to the district court, which granted ALV's motion for judgment and denied LVI's request to vacate the award.

II

This court reviews a district court's confirmation of an arbitration award *de novo*, using the same standards as the district

4

court.[2] Judicial review of an arbitration award is "exceedingly deferential."[3] Vacatur is available "only on very narrow grounds,"[4] and federal courts must "defer to the arbitrator's decision when possible."[5] An award must be upheld as long as it "is rationally inferable from the letter or purpose of the underlying agreement."[6] Even "the failure of an arbitrator to correctly apply the law is not a basis for setting aside an arbitrator's award."[7] "It is only when the arbitrator strays from interpretation and application of the agreement and effectively 'dispense[s] his own brand of industrial justice' that his decision may be unenforceable."[8] Moreover, "the arbitrator's selection of a particular remedy is given even more deference than his reading of the underlying contract," and "the remedy lies beyond the arbitrator's jurisdiction only if there is no rational way to explain the remedy...as a logical means of furthering the aims of the

---

[2] *Brown v. Witco Corp.*, 340 F.3d 209, 216 (5th Cir. 2003).

[3] *Kergosien v. Ocean Energy, Inc.*, 390 F.3d 346, 352 (5th Cir. 2004).

[4] *Brabham v. A.G. Edwards & Sons Inc.*, 376 F.3d 377, 380 (5th Cir. 2004).

[5] *Antwine v. Prudential Bache Sec., Inc.*, 899 F.2d 410, 413 (5th Cir. 1990).

[6] *Nauru Phosphate Royalties, Inc. v. Drago Daic Interests, Inc.*, 138 F.3d 160, 164-65 (5th Cir. 1998)(internal quotation marks omitted).

[7] *Kergosien*, 390 F.3d at 356.

[8] *Major League Baseball Players Assoc. v. Garvey*, 532 U.S. 504, 509 (2001)(quoting *Steelworkers v. Enter. Wheel & Car Corp.*, 363 U.S. 593, 597, 80 S. Ct. 1358, 1361 (1960)).

contract."[9]

LVI attacks the arbitration award on two grounds: that the arbitrator manifestly disregarded the law and that the award does not draw its essence from the contracts.  Vacatur based on an arbitrator's manifest disregard of the law is a judicially created ground of relief.[10]  It is extremely narrow, insisting on "more than error or misunderstanding with respect to the law.  The error must have been obvious and capable of being readily and instantly perceived by the average person qualified to serve as an arbitrator."[11]  The arbitrator must "appreciate[] the existence of a clearly governing principle but decide[] to ignore or pay no attention to it."[12]  Moreover, once a manifest disregard is established, the court also "must find that the award resulted in a 'significant injustice'" in order to grant relief.[13]

That the award does not draw its essence from the contract is a statutory ground for vacatur, derived from 9 U.S.C. § 10(a)(4), which permits vacatur when the arbitrator exceeds his powers.[14]  The

---

[9] *Executone Info. Sys., Inc. v. Davis*, 26 F.3d 1314, 1325 (5th Cir. 1994) (internal quotation marks omitted).

[10] *Prestige Ford v. Ford Dealer Computer Servs., Inc.*, 324 F.3d 391, 395-96 (5th Cir. 2003).

[11] *Id.* at 395.

[12] *Id.*

[13] *Kergosien*, 390 F.3d at 355.

[14] *See id.* at 353.

test is "whether the award, however arrived at, is rationally inferable from the contract."[15] "'[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration.'"[16]

LVI argues both grounds. We give the award great deference, looking to both whether the arbitrator "manifestly disregarded the law" and whether the award drew its essence from the contract.

### III

LVI argues first that the arbitrator disregarded the plain meaning of the contracts by construing them as between Selkin and LVI, not ALV and LVI, and considering the losses of Selkin personally, not those of ALV. We are not persuaded. The record shows that the arbitrator was quite aware of the factual nuances of the case, the identities of the parties, and the flow of money.

LVI next argues that, if the arbitrator correctly analyzed only the losses accruing to ALV, then he completely ignored the notice and cure provisions because Selkin never attempted to provide notice and accept cure and, more importantly, ALV through Frazee provided notice and accepted cure of whatever problems may have existed. As the district court recognized, however, Frazee alone could not bind ALV when Selkin was still the President and co-owner. And the arbitrator heard evidence about Selkin's attempts to provide notice and accept cure - which, if one

---

[15] *Id.* at 353-54 (internal quotation marks omitted).

[16] *Id.* at 355 (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25, 103 S. Ct. 927, 941 (1983)).

7

considers Frazee to have implicitly consented to such acts because he was aware of them, means ALV was attempting to provide notice and accept cure - and there is evidence that those attempts were rebuffed, or at a minimum not satisfied by LVI. In any event, the arbitrator could have found that LVI had notice of the problems forming the basis of this entire dispute.

Third, LVI challenges the actual amount of the award. It argues that even if ALV might legitimately recover damages for the sublease breaches, and even if ALV recovered all such damages that it requested, the arbitrator also must have awarded about $1.3 million in lost income damages for 2002-2003. First, LVI contends, this represents damages to Selkin, not ALV. As we have noted, however, the arbitrator understood the distinction. Second, it contends, either ALV failed to mitigate its damages by not hiring another doctor or Selkin fully mitigated all damages flowing to ALV with his high earnings in North Carolina and Tennessee. The first argument ignores the nature of LVI's breach - Selkin refused to continue working because LVI was allegedly interfering in his practice, and it wasn't unreasonable for the arbitrator to conclude that, under those facts, ALV was not obligated to hire another surgeon until LVI addressed its allegedly substandard performance. The second argument fails because the arbitrator did not award ALV the full amount of lost income damages it sought. Moreover, he heard testimony regarding the possibility that Selkin could have performed surgeries in North Carolina and Tennessee while also

8

performing them for ALV in Texas. Indeed, the record reveals that the arbitrator dealt extensively with this possibility and recognized its difficulties.

## IV

LVI also urges that, at a minimum, we should remand for the arbitrator to clarify the nature of his award. Remand is rare, appropriate only "when an award is patently ambiguous, when the issues submitted were not fully resolved, or when the language of the award has generated a collateral dispute."[17] None of those situations is present here. Although, as explained above, the exact basis for the award is unclear, the parties agreed that the arbitrator need not state his reasons.

## V

We will not second-guess multiple, implicit findings and conclusions underpinning the award. We do not decide if the award was free from error. We decide only that it is not the kind of extraordinary award that ineluctably leads to the conclusion that the arbitrator was "dispensing his own brand of industrial justice." There are advantages and disadvantages in contracting for private resolution of a dispute announced without explanation of reason. When a party does so and loses, federal courts cannot rewrite the contract and offer review the party contracted away.

AFFIRMED.

---

[17] *See Oil, Chem., & Atomic Workers Int'l Union v. Rohm & Haas, Tex., Inc.*, 677 F.2d 492, 495 (5th Cir. 1982).